## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

GEORGE LEE                                                CIVIL ACTION

VERSUS                                                    NO.  10-1712

VENETIA MICHAEL, WARDEN                                   SECTION "B"(4)

## REPORT AND RECOMMENDATION

      This matter was referred to a United States Magistrate Judge to conduct hearings, including

an evidentiary hearing if necessary, and to submit proposed findings and recommendations pursuant

to **28 U.S.C. § 636(b)(1)(B) and (C)**, and as applicable, **Rule 8(b) of the Rules Governing Section

2254 Cases**.  Upon review of the entire record, the Court has determined that this matter can be

disposed of without an evidentiary hearing.  *See* 28 U.S.C. § 2254(e)(2) (2006).[1]

I.     **Factual and State Procedural Background**

      The petitioner, George Lee ("Lee"), is a convicted inmate incarcerated in the David Wade

Correctional Center in Homer, Louisiana.[2]  On November 19, 1999, in Case No. 410-779, Lee was

charged by bill of information in Orleans Parish with the following seven counts: extortion, second

degree kidnapping, and sexual battery of D. Williams; extortion, second degree kidnapping, and

---

    [1]Under 28 U.S.C. § 2254(e)(2), an evidentiary hearing is held only when the petitioner shows that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

    [2]Rec. Doc. No. 1.

sexual battery of T.C.; and second degree kidnapping of Marvin Pepp.[3]  Lee was tried on January

20, 2000, on the four counts related to T.C. and Pepp.[4]  The jury found him not guilty of extortion

and could not agree on a verdict as to sexual battery and the two counts of second degree

kidnapping.  Eventually, on February 24, 2000, the State entered a nolle prosequi as to the six

unresolved charges in that bill of information.[5]

On March 17, 2000, in Case No. 412-994, the State filed another bill of information charging

Lee with six counts of forcible rape and four counts of second degree kidnapping, naming the

victims as D. Williams, T.C., and D.W..  Trial on these counts began on April 3, 2000, and on April

5, 2000, the state trial court declared a mistrial, finding the State had concealed *Brady* material in

the form of statements and/or audio tapes of witness interviews.  By subsequent ruling of the

Louisiana Fourth Circuit, the State was ordered to review its file and produce any evidence related

to the credibility of its witnesses and to provide the defense with a list of any statements in its

possession, including the name of the person who gave the statement and the date the statement was

made.[6]  This Court further directed that the parties could move to have the trial court review the

evidence *in camera* to determine whether the defense was entitled to it.

On May 19, 2000, the State entered a nolle prosequi as to each of the charges in Case No.

412-994.  That same day, the State filed a third bill of information in Case No. 414-519, charging

Lee with two counts of forcible rape and two counts of second degree kidnapping of D. Williams,

---

[3]St. Rec. Vol. 25 of 35, Bill of Information, 11/18/99.  For a complete recitation of the early procedural history of Lee's criminal proceedings, see *State v. Lee*, 778 So.2d 656, 656-59 (La. App. 4th Cir. 2001).

[4]St. Rec. Vol. 1 of 35, Trial Transcript, 1/20/00.

[5]St. Rec. Vol. 25 of 35, Bill of Information (handwritten notations dated 2/24/00), 11/18/99.

[6]*State v. Lee*, 767 So.2d 97, 101 (La. App. 4th Cir. 2000).

one count of forcible rape and one count of second degree kidnapping of C.P., two counts of forcible rape and two counts of second degree kidnapping of D.W., one count of forcible rape of U.H., and one count of forcible rape of T.C..

According to the record, the State produced the list of all statements in its possession. On May 30, 2000, it turned over the tapes of these statements to the court for an *in camera* inspection for any *Brady* material. The trial court then turned the tapes over to the defense. The State learned of the trial court's action at a status conference on June 12, 2000, the day before trial was scheduled to begin.

On June 13, 2000, the trial court held another status conference and the parties again met in court, and at that time the court learned that the State was again in possession of the taped statements. The court ordered the State to give the tapes back to the defense, admitting that it did not review the tapes before handing them over to the defense, because it would have taken too much time to do so. The Louisiana Fourth Circuit later ordered the trial court to conduct the *in camera* inspection of the tapes and that only those containing exculpatory material were to be turned over to the defense.[7]

Trial began on October 18, 2000, and after two days on October 20, 2000, defense counsel filed a motion for contempt for prosecutorial misconduct on the part of the prosecutor based on the failure to disclose the discovery of a wad of napkins in the uniform pants seized from Lee after his arrest. The defendant also filed motions to suppress the evidence and for a mistrial. The trial court recessed the trial and held a hearing on the motions on October 23 through 25, 2000. On October 25, 2000, the trial court dismissed the defense motion for contempt and the court *sua sponte* found

---

[7]*State v. Lee*, 759 So.2d 78 (La. App. 4th Cir. 2000).

the prosecutor in constructive contempt and alternatively found prosecutorial misconduct.  The trial court sentenced the prosecutor to six months in Orleans Parish Prison and granted the motion to suppress and the motion for a mistrial.  The trial court declared a mistrial and released the jurors.

On remand from the appellate court and after further hearings, the trial court again found the prosecutor in contempt for tampering with evidence and for violation of discovery rules, and resentenced him to six months and to pay a fine.[8]  The appellate court also later affirmed the suppression of the napkins.[9]

The Louisiana Supreme Court eventually reversed the conviction for constructive contempt on the ground of tampering with evidence, and affirmed his conviction for constructive contempt on the ground of willful failure to timely disclose the discovery of the napkins.[10]  The court vacated the six-month sentence imposed on the assistant district attorney, and imposed a $500 fine on him. On January 25, 2001, the trial court conducted a lunacy hearing, finding Lee competent to proceed to trial.

Lee was tried before a jury on February 6 through 10, 2001.[11]  The evidence at trial revealed that, in the early morning hours of March 28, 1999, C.P. testified that she was raped by Lee.[12]  She was talking with a friend in his parked car on Terpsichore Street, between Baronne and Carondelet

---

[8]*State v. Lee*, 787 So.2d 1020 (La. App. 4th Cir. 2001); *State v. Lee*, 778 So.2d at 656.

[9]*State v. Lee*, 778 So.2d at 656.

[10]*State v. Lee*, 800 So.2d 833 (La. 2001).

[11]St. Rec. Vol. 26 of 35, Trial Minutes, 2/6/01; Trial Minutes 2/7/01; Trial Minutes, 2/8/01; Trial Minutes, 2/9/01; Trial Minutes, 2/10/01; St. Rec. Vol. 19 of 35, Trial Transcript, 2/6-10/01; St. Rec. Vol. 20 of 35, Trial Transcript (continued), 2/6-10/01; St. Rec. Vol. 21 of 35, Trial Transcript (continued), 2/6-10/01; St. Rec. Vol. 22 of 35, Trial Transcript (continued), 2/6-10/01.

[12]The facts are taken from the published opinion of the Louisiana Fourth Circuit on direct appeal.  *State v. Lee*, 844 So.2d 970 (La. App. 4th  Cir. 2003); St. Rec. Vol. 25 of 35, 4th Cir. Opinion, 2002-KA-1793, 4/2/03.

Streets.  Lee, dressed in street clothes, approached the car and flashed a badge.  C.P.'s friend got out and went to the back of the car, where he had a conversation with Lee.  Lee then ordered C.P. out of the car and into his nearby car, a green two-door car with dark-tinted windows.  He drove her to South Peters, near Glazer Steel.  On the way, Lee told her he had been watching her "big fine ass," and he ordered her to pull her pants down and lean out the driver's side window.  He then raped her anally, wearing a blue condom.  C.P. hollered and screamed and asked him to stop several times.  Lee told her that if she could not stand it, she did not have any business "being out there."  He finished, threw away the condom, and cleaned up with a paper towel, which he also threw away.  Lee subsequently dropped her off at South Liberty Street and Martin Luther King Boulevard.

C.P. admitted that she had engaged in prostitution, but she had not been on a "date" that night.  After the assault, C.P. could not control her bowels, and had to change her underwear.  C.P. identified photos of Lee's personal car, a two-door green Lexus with tinted windows.

A couple of months later, Lee showed up at C.P.'s apartment while she was with a "date."  Lee entered the apartment when C.P. answered his knock at the door.  He was wearing a uniform with dark blue pants with big pockets.  He threw her date against a wall.  C.P. did not report the rape until after she was taken to jail for public drunkenness.  She saw on television that Lee had been accused of rape, and she decided to come forward.  She met with someone from the District Attorney's office after she got out of jail.  She identified Lee in a photo lineup on September 3, 1999.

D.W., another career criminal with two prior convictions for prostitution and one for drugs, testified that Lee raped her twice.  The first time was in June of 1999.  She was using drugs with a friend, Tony, at his residence in the 2400 block of Louisa Street.  She later left and was walking toward North Galvez Street when Lee drove up and offered her a ride in a dark blue or purple Crown

5

Victoria-type vehicle.  D.W. accepted, saying she needed a ride to New Orleans East.  Lee drove

toward North Claiborne Avenue.  Out of habit as a prostitute, she asked him if he was a police

officer.  Lee countered by asking her if he looked like a police officer.  He also asked her if she

dated, which D.W. interpreted to mean as a prostitute.  She said she sometimes did.  He said he had

$20 and asked what she would do for that.  She said either oral sex or intercourse.  He gave her a

$20 bill.  He pulled over underneath the North Claiborne Avenue overpass.  He exited the car, came

around to her door, and told her to stand up.  When she stood up, he grabbed the $20 bill out of her

hand and showed her his police badge.  She said he had what looked like a police radio and a gun

on his side.  She asked his name, and he said it was Ronnie Williams.  She said he had her, and that

he could take her to jail.  He also said he was not going to take her to jail but that she was going to

do what he wanted her to do.

    Lee told D.W. to lie across the seat, and she complied.  He undid his pants and had vaginal

intercourse with her.  While doing so, he asked her if she ever had anal sex.  She said no, that she

did not do that, and begged him not to do that to her.  He then raped her anally, and he ejaculated

in her rectum.  Lee left the scene after the rape, warning her not to tell anyone.

    On the second occasion, D.W. was leaving her aunt's nursing home on Chef Menteur

Highway at 10:00 p.m.  She was with her cousin Zachary Turrell, and they were talking about

getting money to get high when Lee drove by in an Explorer.  D.W. told Turrell that she thought this

would be a prostitution date.  Turrell asked her not to go, but D.W. entered the vehicle anyway.  Lee

asked where she was headed.  She said she was going toward Winn-Dixie.  A short while after

entering the vehicle, D.W. asked him if she knew him.  He said no, that he was not from here.  After

looking at Lee, particularly noting his bad skin, D.W. told him that she remembered who he was.

She told him that he was the one who liked anal sex.  Lee replied that it was about to happen again.

6

There was never any discussion about money.  D.W. noted that Lee did not immediately recognize her, but then recognized her hand, which was somewhat deformed.  He told D.W. that he was going to have to kill her, and that she was not going to be assaulted again.  He was holding his gun, which was on his side, and threatened that he could get her.  Lee drove her to Old Gentilly Road, in front of a junk yard.  At this point he had the gun in his hand, in his lap.  Lee raped her anally, using a condom.  Before letting her out of the car after raping her a second time, Lee offered D.W. $40.  She said that for what he did to her it should be $100.  Lee then dropped D.W. off back at her aunt's nursing home.  She told Turrell that there was a man out there pretending to be a police officer.  She went to Turrell's apartment and took a shower.  She telephoned the police the next day or within the week after she saw Lee on television.

On July 22, 1999, U.H. was visiting New Orleans from St. Louis.  She and a friend, Thomas Emory went to a daiquiri shop and then to Bayou St. John.  Lee approached their car with a flashlight, wearing a police uniform.  Lee separated the two, moving Emory over to some trees, and keeping her at the car.  He asked her for identification and questioned her.  He went over to Emory, and returned to tell U.H. there was a warrant out for her arrest.  U.H. knew she had an outstanding warrant from St. Louis.  Lee mentioned something about money, and U.H. thought he might be shaking her down.  She offered him $200, but he did not take it.  U.H. said the next thing she knew, Emory entered his car and drove away.  Lee told her that they were going to work it out, and said something about a female officer who was supposed to come on the scene and drive her down to where Emory was waiting with the hood of his car up.

U.H. saw the motion of Lee putting on a condom.  He opened the passenger side door and ordered her to bend over and pull down her shorts.  She complied, because she thought he was going to hurt her.  By that time she had begun to doubt that he was a police officer.  Lee penetrated her

vagina.  U.H. knew she had started her period and consequently knew she left blood on the seat. Afterward, defendant dropped her off where Emory was waiting.  U.H. at first hesitated to tell Emory what happened, fearing he would try to do something to Lee.  She told him after Lee drove out of sight in a dark burgundy Cavalier.  She did not call police that night because she thought no one would believe her.

U.H. moved back to St. Louis the next week because she did not feel safe, and she did not return until September of 1999.  Upon her return, she viewed a news report about a police officer raping a woman, causing her to feel a little guilty about not reporting her rape.  She contacted police, but she was reluctant to reveal her identity.  She was afraid to talk to police alone, fearing police would blame her or make her out as a bad person because she was a dancer. Emory contacted an attorney to accompany them to a meeting with police.  She identified Lee's photograph in a lineup on February 18, 2000.

On August 22, 1999, T.C. reported that a New Orleans Police Officer named "C. or G. Lee" had raped her.  Around 10:00 or 11:00 p.m., T.C. and Marvin Pepp were driving to Jaeger's restaurant where Pepp had parked his car.  Her car, a 1989 Ford Escort, began making a funny noise so they pulled over on Wisner Boulevard across from City Park, so Pepp could inspect the engine. While Pepp was out of the car, Lee walked up in uniform carrying his gun and a flashlight and asked what they were doing.  Lee asked them both for identification and asked if they had ever been arrested.  Lee ordered her out and told her to put her hands on the hood of her car.

Lee handcuffed Pepp and walked him to a car hidden behind some bushes about 50 feet away.  He put him in the backseat next to a babyseat.  A van was parked behind the car, and Lee sent the van off.  Lee told Pepp that he had a warrant out for him, that he was going to jail, and that he was going to call a cruiser to pick up T.C.  Lee went back to T.C.'s car.

Lee told T.C. that Pepp had an outstanding arrest warrant.  He told T.C. how fine and pretty she was, and asked her what her husband would say if he knew she was out there.  Lee asked her what kind of panties she was wearing, and she told him bikinis.  He asked to see, and then lifted up her dress.  She still had her hands on the hood of the car.  Lee exclaimed that she was "fine," and started feeling her buttocks and moved his hand to rub around her vagina.  He asked her what she would do to keep from going to jail.  He unzipped his pants, pulled her panties to the side, and inserted his penis into her vagina.  He took off his gun belt at one point and put it on the top of the car.  He pointed his flashlight toward the direction where T.C. had seen some headlights minutes before.  He then ordered her into the car and raped her again on the back seat.  When Lee expressed an interest in anally penetrating T.C., she said the only thing she wanted him to do was to get off of her.  He got off of her, and she got out of the car.  He made her stand by the car, and he ejaculated on the ground.

Lee subsequently told her that she could be with him, that he would take care of her.  He said he would bring her $300 the next day.  She thought he was crazy, but asked him his name.  He said his name was William Smith.  Lee gathered up his gun belt and said he was going to release Pepp.  When he returned to Pepp, he was nervous and sweating, and was fixing his pants and gun belt.  Lee said something about chasing someone, and that he had to take that person to jail.  Lee unlocked the handcuffs on Pepp and told him to walk away and not to turn around.  When Pepp returned to the car, T.C. would not tell him what Lee had done fearing that the unarmed Pepp would go after the armed policeman.  She eventually told him and two friends, and reported the incident to police.

Crime lab personnel collected some napkins at the scene of the crime along Wisner Boulevard near Filmore Avenue, near Bayou St. John.  T.C. described the police officer as a black male, approximately five feet seven inches tall, 28 to 32 years old.  By process of elimination,

George Lee was the only officer fitting that description.  T.C. identified Lee in a photo lineup shown to her by police.  Pepp was unable to make an identification.

Pursuant to a search warrant, officers searched Lee's person, his residence, his unmarked police car, and his mother's residence.  The officers seized evidence including, a plain gold wedding band, a baby seat seized from the rear seat of the unmarked police car, and three condoms found in a shotgun case in the car.  The officers also learned that Lee had accessed the criminal history of Marvin Pepp between January 24 and February 1, 2000.

Felicia Moran testified that she worked as a cashier at the Winn-Dixie supermarket on North Carrollton Avenue from 11:00 p.m. to 6:00 a.m. on the night of August 22-23, 1999.  Lee was working a security detail that night, wearing a regular New Orleans Police Department uniform.  Lee told Moran that he had sex with a "freak" on the bayou, and that he had to give her $300.  Moran happened to know T.C. through another woman named Gail Cotton, who also worked at the Winn-Dixie and who was present when Lee made the remark.  Several days later, Moran spoke to Cotton, who put T.C. on the telephone.  T.C. was crying and upset.

In a taped statement played for the jury, Lee claimed to have had consensual sex with T.C. in a driveway not very far from City Park.  Lee mentioned napkins in his statement.  No napkins were found at the location described by Lee, but napkins were found at the location where T.C. said the assault occurred.  Those napkins tested negative for sperm, and therefore no DNA testing was conducted.  Lee was arrested on August 24, 1999, the day after he gave a second statement, which was also played at trial.

On February 10, 2001, the jury found Lee guilty as charged on the five forcible rape counts and three second degree kidnapping counts related to C.P., D.W., U.H., and T.C..  The State later entered a nolle prosequi on the remaining four counts related to D. Williams.

On March 13, 2001, the trial court denied Lee's motion for new trial and sentenced him to serve concurrent sentences of 30 years each on the three counts of forcible rape related to C.P. and D.W., 25 years on the forcible rape charge related to U.H., five years on the forcible rape charge related to T.C., and 10 years as to each of the second degree kidnapping counts, with the sentences to be without benefit of parole, probation, or suspension of sentence.  The Court also sentenced Lee to two years at hard labor, without benefit of parole, probation, or suspension of sentence for possessing a firearm at the time he committed the crimes.

On appeal, Lee's counsel raised four assignments of error:[13] (1) the Trial Court erred in denying the motion to quash and/or to dismiss based on double jeopardy and prosecutorial misconduct; (2) insufficient evidence regarding second degree kidnapping of D.W. or C.P. or forcible rape as to D.W.; (3) the Trial Court erred in allowing impermissible evidence of Lee's character; and (4) the Trial Court erred in sentencing Lee under the firearm provisions.  On April 2, 2003, the Louisiana Fourth Circuit affirmed Lee's conviction finding no merit in the claims.  The Court vacated the two year sentence and remanded for resentencing in compliance with the firearm statute.[14]  The record does not reflect whether Lee was resentenced under that provision.

The Louisiana Supreme Court denied without stated reasons Lee's subsequent writ application on October 10, 2003.[15]  Lee's convictions and sentences became final 90 days later, on January 8, 2004, because he did not file a writ application with the United States Supreme Court. *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United

---

[13]St. Rec. Vol. 25 of 35, Appeal Brief, 2002-KA-1793, 10/25/02.

[14]*State v. Lee*, 844 So.2d at 970; St. Rec. Vol. 25 of 35, 4th Cir. Opinion, 2002-KA-1793, 4/2/03.

[15]*State v. Lee*, (La. 2003); St. Rec. Vol. 25 of 35, La. S. Ct. Order, 2003-K-1247, 10/10/03; La. S. Ct. Writ Application, 03-K-1247, 5/2/03.

States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A));

U.S. S. Ct. Rule 13(1); *see also*, *Jiminez v. Quarterman*, 555 U.S. 113, __, 129 S. Ct. 681, 686-87

(2009) (where a state court grants a criminal defendant the right to file an out-of-time appeal during

state collateral review, his judgment is not yet final for purposes of seeking federal habeas review);

*see also*, *Burton v. Stewart*, 549 U.S. 147, 156-57 (2007) (the AEDPA limitations period "did not

begin until both his conviction and sentence became final by the conclusion of direct review or the

expiration of the time for seeking such review." (emphasis added, quotation omitted)).

On October 8, 2004, Lee's counsel filed an application for post-conviction relief alleging

four grounds for relief: (1) the State failed to give notice of its intent to introduce evidence of highly

prejudicial and speculative other crimes evidence at trial; (2) the State's prejudicial action and

misconduct permeated the trial and so infected the entire proceedings with unfairness as to render

the conviction reached in this matter unreliable; (3) he was denied effective assistance of counsel

as provided in that trial counsel's numerous incidents of ineffectiveness led to a manifest absence;

and (4) he was denied a fair trial when the State failed to provide critical information prior to trial,

despite discovery requests, and further failed to provide exculpatory evidence to the defense in

violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

After hearings held April 3 and 7, 2008, the state trial court denied the application.[16]  The

Louisiana Fourth Circuit also denied relief finding that none of Lee's claims had merit.[17]  The Court

noted that many of Lee's arguments had been raised on appeal and did not warrant reconsideration,

citing La. Code Crim. P. 930.4.  The Court further held that by the fourth trial, the State had

---

[16] St. Rec. Vol. 18 of 35, Minute Entry, 4/3/08; Hearing Minutes, 4/7/08; St. Rec. Vol. 34 of 35, Hearing Transcript, 4/3/08; Hearing Transcript, 4/7/08.

[17] St. Rec. Vol. 34 of 35, 4th Cir. Order, 2009-K-0017, 3/18/09; 4th Cir. Writ Application, 2004-K-0017, 1/5/09.

provided all of the exculpatory material. The Court further resolved that counsel's performance did not fall below reasonable standards. The Louisiana Supreme Court also denied Lee's related writ application without stated reasons on March 12, 2010.[18]

## II.   Federal Petition

On June 9, 2010, Lee through counsel, filed this petition for federal habeas corpus relief in which he raised four grounds for relief:[19] (1) the State failed to give notice of its intent to introduce evidence of highly prejudicial and speculative other crimes evidence at trial regarding extortion, including the charge for which he was acquitted; and (2) the State's prejudicial action and misconduct permeated the trial and so infected the entire proceedings with unfairness as to render the conviction reached in this matter unreliable where the prosecutor referenced his failure to testify, made a witness unavailable, and disregarded courtroom procedure.

He also alleges that he was denied effective assistance of counsel as provided in that trial counsel's numerous incidents of ineffectiveness led to a manifest absence of counsel where trial counsel (a) failed to prepare for trial, (b) failed to make timely objections, failed to follow up on sustained objections, (c) failed to press the trial court for rulings on objections, (d) failed to state grounds when moving for mistrials, (e) introduced damaging and prejudicial information against Lee, including charges that had been dropped and prior bad acts, (f) failed to control himself resulting in his removal during a crucial piece of testimony for the State, (g) failed to preserve the record for appeal by lodging the proper objection to the admission of evidence of prior bad acts, and (h) failed to ensure the complete record was being transcribed and where appellate counsel failed to obtain the missing portions of the record and failed to raise meritorious issues on appeal; and (4)

---

[18]*State v. Lee*, 28 So.3d 1019 (La. 2010).

[19]Rec. Doc. No. 1.

he was denied a fair trial when the State failed to provide critical information prior to trial, despite discovery requests, and further failed to provide exculpatory evidence to the defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), specifically the statements of Marvin Pepp, a handwritten statement made by T.C., U.H.'s medical records, and 48 audiotapes containing witness statements.

The State filed a response in opposition to Lee's petition arguing that the second claim regarding prosecutorial misconduct is in procedural default under La. Code Crim. P. art. 930.4(B), and the remaining claims are without merit.[20]  The State further argues that part of the first claim regarding notice of the intent to use evidence of other crimes is based on state law and is not appropriate for federal habeas review.  The State contends that the remainder of that claim and the others are without merit, and the petition should be denied.

## III.   **General Standards of Review**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214,[21] applies to this petition which was filed by Lee's counsel on June 9, 2010.  The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c) (2006)).

---

[20]Rec. Doc. Nos. 11, 12.

[21]The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and applied to habeas petitions filed after its effective date, April 24, 1996.  *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).  The AEDPA, signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

The State concedes, and the record shows, that Lee's petition is timely and his claims are exhausted. The State also suggests that Lee's prosecutorial misconduct claim is in procedural default because the Louisiana Fourth Circuit noted that some of his post-conviction claims had been raised on appeal and did not warrant reconsideration under La. Code Crim. P. art. 930.4. The Court disagrees.

The State argues that the Louisiana Fourth Circuit's reference to La. Code Crim. P. art. 930.4 would also include Article 930.4(b) which would preclude review of claims that should have been raised on appeal. Contrary to the State's argument, there is no indication in the Louisiana Fourth Circuit's order that it clearly relied on that provision to preclude review of Lee's prosecutorial misconduct claim. The Court instead clearly stated "that some of relator's assignments in this application have been previously considered by this court and are not properly reconsidered. La. C.Cr.P. art. 930.4."[22] The Court made no reference to claims that should or could have been raised on appeal and were not. The Court's written word refers to La. Code Crim. P. art. 930.4(A) which precludes further review of claims already addressed on appeal. It did not reject the claim or dismiss it on procedural grounds discernable from the opinion. For these reasons, the Court rejects the State's defense regarding procedural default of the prosecutorial misconduct claim. The Court will proceed to review the merits of Lee's claims.

## IV.   <u>Standards of a Merits Review</u>

The AEDPA standard of review is governed by § 2254(d) and the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000). It provides different standards for questions of fact, questions of law, and mixed questions of fact and law.

---

[22]St. Rec. Vol. 34 of 35, 4th Cir. Order, 2009-K-0017, p. 1 n. 1, 3/18/09.

A state court's determinations of questions of fact are presumed correct and the court must give deference to the state court findings unless they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(2) (2006); *see Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001).  The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1) (2006).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), as amended by the AEDPA.  The standard provides that deference be given to the state court's decision unless the decision is "contrary to or involves an unreasonable application of clearly established federal law" as determined by the United States Supreme Court.  *Hill*, 210 F.3d at 485.

A state court's decision can be "contrary to" federal law if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06, 412-13; *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Hill*, 210 F.3d at 485.  A state court's decision can involve an "unreasonable application" of federal law if it either: (1) correctly identifies the governing rule but then applies it unreasonably to the facts; or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable.  *Williams*, 529 U.S. at 406-08, 413; *Penry*, 532 U.S. at 792.

The Supreme Court in *Williams* did not specifically define "unreasonable" in the context of decisions involving unreasonable applications of federal law.  *cf. Wright v. West*, 505 U.S. 277, 304 (1992).  The court, however, noted that an unreasonable application of federal law is different from

16

an incorrect application of federal law.  *See, e.g., id.* at 305; *see also Chambers v. Johnson*, 218 F.3d

360, 364 (5th Cir. 2000), *cert. denied*, 531 U.S. 1002 (2000).  "'[A] federal habeas court may not

issue the writ simply because that court concludes in its independent judgment that the state-court

decision applied [a Supreme Court case] incorrectly.'"  *Price v. Vincent*, 538 U.S. 634, 641 (2003)

(quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)) (brackets in original); *Bell v. Cone*, 535

U.S. 685, 699 (2002)).

Thus, under the "unreasonable application" determination, the Court need not determine

whether the state court's reasoning is sound, rather "the only question for a federal habeas court is

whether the state court's determination is objectively unreasonable." *Neal v. Puckett*, 286 F.3d 230,

246 (5th Cir. 2002).  The burden is on the petitioner to show that the state court applied the

precedent to the facts of his case in an objectively unreasonable manner.  *Price*, 538 U.S. at 641

(quoting  *Woodford*, 537 U.S. at 24-25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006).

**V.**     **Analysis**

**A.**     **Notice Regarding Other Crimes Evidence**

Lee argues that his constitutional rights were violated where the State failed to give notice

of its intent to introduce evidence of other crimes evidence at trial.  Lee specifically refers to

testimony from two witnesses regarding extortion, including the extortion charge for which Lee was

acquitted.

In its opposition, the State argues that this claim is based on state law.  The State further

contends that Lee fails to raise a claim for federal habeas relief.

On direct appeal, Lee challenged the admission of testimony from T.C. regarding the fact

that Lee took money from her to keep Pepp from being arrested.  The Louisiana Fourth Circuit

denied relief because it resolved that the evidence was admissible under La. Code Ev. art. 404(B)

17

as an integral part of the crime charged. Lee alleged in his Application for post-conviction relief that he was not given adequate notice of the State's intent to use the extortion testimony at trial. The Trial Court denied relief after the evidentiary hearings but did not state its reasons. The Louisiana Fourth Circuit did not squarely address the claim, and instead chose not to review the issue because the admission of other crimes evidence was addressed on appeal, the claim did not warrant consideration on post-conviction review. The Louisiana Fourth Circuit provided the last reasoned decision on the admissibility of the alleged other crimes evidence. *Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991) (when the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, the federal court will presume that the state court has relied upon the same grounds as the last reasoned state court opinion).

Lee alleges that his constitutional rights were violated where the State was allowed to introduce evidence of other crimes or bad acts during trial. He specifically points to the testimony from T.C. and U.H. about Lee's apparent attempts to obtain money from the victims in exchange for their freedom from arrest. He also complains that the State introduced evidence that he abused his police access to NCIC to investigate Marvin Pepp after the incident with D.W. and Pepp.

Habeas corpus review is, however, limited to questions of constitutional dimension, and federal courts generally do not review the admissibility of evidence under state law. *Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992). States are free to implement procedures regarding the admission of evidence, provided that those procedures do not infringe on a constitutional guarantee. *Burgett v. State of Texas*, 389 U.S. 109 (1967). Therefore, federal courts do not sit to review the propriety of state court evidentiary rulings, unless the proceedings violate due process such that the violation renders the criminal proceeding fundamentally unfair. *Lisenba v. People of the St. of Ca.*, 314 U.S. 219, 236-37 (1941); *see Swarthout v. Cooke*, __ U.S. __, 131 S. Ct. 859, 861 (2011)

(federal habeas review does not lie for errors of or in applying state law); *see also United States v. Derden*, 978 F.2d 1453, 1458 (5th Cir. 1992) (errors of state law, including evidentiary errors, are <u>not</u> cognizable in habeas corpus, as such, and only rise to constitutional dimension if they so infuse the trial with unfairness as to deny due process such that they more likely than not caused a suspect verdict); *Peters v. Whitley*, 942 F.2d 937, 940 (5th Cir. 1991) (habeas review is proper only to determine whether a state trial judge's error is so extreme as to render the trial fundamentally unfair or violate an explicit constitutional right).

The question of due process in the criminal proceeding presents a mixed question of law and fact. *Dickson v. Sullivan*, 849 F.2d 403, 405-06 (9th Cir. 1988). Under the applicable standard of review, this court therefore must determine if the state court's decision is contrary to or involved an unreasonable application of Supreme Court precedent.

In *Lisenba*, the Supreme Court stated that the denial of due process "is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." *Lisenba*, 314 U.S. at 236. In keeping with this principle, the United States Fifth Circuit Court of Appeals has stated that the admission of prejudicial evidence is fundamentally unfair so as to justify federal habeas corpus relief <u>only</u> if it is "material in the sense of a crucial, critical, highly significant factor." *Hills v. Henderson*, 529 F.2d 397, 401 (5th Cir. 1976) (quotation omitted); *Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir. 1983).

In this case, the testimonial evidence referenced by Lee was found to be admissible under Louisiana law as forming an integral part of the crimes he committed.[23]   In *State v. Prieur*, 277 So.2d 126 (La. 1973), the Louisiana Supreme Court held that evidence of other acts of misconduct is <u>generally</u> not admissible to show the defendant's bad character, but that such evidence is allowed to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is part of the subject of the present proceeding.   *See also* La. Code Evid. art. 404(B)(1); *State v. Jackson*, 625 So.2d 146, 148 (La. 1993).   Under Louisiana law, to constitute impermissible other crimes evidence, the evidence must unambiguously implicate the defendant in another crime and not meet one of the aforementioned exceptions.   *State v. Edwards*, 406 So.2d 1331, 1349 (La. 1981); *State v. Holmes*, 841 So.2d 80 (La. App. 4th Cir. 2003).

Both T.C. and U.H. testified at trial that, after they were stopped by Lee, he led them to believe that if they gave him money, either they or their companions would not be arrested.   Each attempted to cooperate with him believing him to be a policeman on the take.   Lee would separate the women from their male companions and then demand sexual favors rather than money.   Based on the record, their was no error in the state's courts admission of this evidence as an integral part of Lee's rapes and kidnapping.

Similarly, the record demonstrates that Lee accessed police computer records to run a check on Marvin Pepp, who had originally been identified as a victim of one of the second degree kidnappings.   Although the State did not pursue those charges at the fourth trial, this tended to

---

[23] *State v. Lee*, 844 So.2d at 970; St. Rec. Vol. 25 of 35, 4th Cir. Opinion, 2002-KA-1793, 4/2/03.

confirm the allegation that Lee also stalked the victims, at least Pepp and D.W. after her initial rape. This too was an integral part of his criminal activity surrounding the rapes and kidnappings.

Lee, therefore, has not established that the indicated testimony was inadmissible other crimes evidence under Louisiana law or that the testimony was crucial to the verdict.  The testimony was not solely given to establish Lee's bad character, but was instead given to explain the mind-set of the victims.  Because Lee has not demonstrated an error in the admission of this testimony and evidence, he "has no basis for any alleged due process violation" or for a denial of a fundamentally fair trial.  *See Robinson v. Whitley*, 2 F.3d 562, 567 (5th Cir. 1993); *see also Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998).

The state courts' denial of relief on this issue was not contrary to or an unreasonable application of Supreme Court law.  Lee is not entitled to relief on this claim.

**B.**     **Prosecutorial Misconduct**

Lee alleges that the State engaged in prejudicial actions and misconduct which permeated the trial and infected the entire proceedings with unfairness.  Lee specifically alleges that the prosecutor referenced his failure to testify, the State caused a witness to be unavailable, and the State disregarded courtroom procedure.  The State argues that Lee's claim is without merit.

Lee raised this claim on post-conviction relief which was denied without reasons by the trial court after two evidentiary hearings.  The Louisiana Fourth Circuit did not specify its reasons for denying this claim.

**1.**     **Comment During Closing Argument**

Lee first claims that, during closing arguments, the prosecutor made an improper reference to his failure to testify.  He argues that the granting of the defense request for mistrial was required

under La. Code Crim. P. art. 770(3).  As discussed previously, any violation of state law by the prosecutor or the state trial court is not sufficient to establish a basis for federal habeas corpus relief.

Generally, improper jury argument by the State does not present a claim of constitutional magnitude in a federal habeas action unless it is so prejudicial that the state court trial was rendered fundamentally unfair within the meaning of the Due Process Clause.  *Jones v. Butler*, 864 F.2d 348, 356 (5th Cir. 1988).  Due process requires reversal when the prosecutor's argument or comments "so infect the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Bell v. Lynaugh*, 828 F.2d 1085, 1095 (5th Cir. 1987).  The prosecutor's remarks must be evaluated in the context of the entire trial.  *Greer v. Miller*, 483 U.S. 756, 765-66 (1987) (citing *Darden*, 477 U.S. at 179); *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1985).  Thus, to obtain federal habeas relief based on allegations of improper prosecutorial comment or argument, a petitioner "must demonstrate that the misconduct [was] persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks." *Jones*, 864 F.2d at 356; *Hogue v. Scott*, 874 F. Supp. 1486, 1533 (N.D. Tex. 1994).

Comments by a prosecutor  on a defendant's exercising his Fifth Amendment right not to testify are, of course, constitutionally impermissible.  *Griffin v. California*, 380 U.S. 609, 615 (1965).  To determine whether a petitioner's Fifth Amendment rights were violated, the proper inquiry is: "(1) whether the prosecutor's manifest intent was to comment on the defendant's silence or (2) whether the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence."  *United States v. Grosz*, 76 F.3d 1318, 1326 (5th Cir. 1996) (quoting *United States v. Collins*, 972 F.2d 1385, 1406 (5th Cir. 1992)) (internal quotation marks omitted).

22

Under the first possibility, "[t]he prosecutor's intent is not manifest if there is some other, equally plausible explanation for the remark." *Id.* Under the second possibility, "the question is not whether the jury possibly or even probably would view the challenged remark in this manner, but whether the jury necessarily would have done so." *Id.* (citation, emphasis, and internal quotation marks omitted). Moreover, the Fifth Amendment is not violated when the comments are made in "a fair response to a claim made by defendant or his counsel." *United States v. Robinson*, 485 U.S. 25, 32 (1988).

In this case, the comments made by the prosecutor during closing arguments were not prohibited under the Due Process Clause or in violation of the Fifth Amendment. Between the inordinate number of objections raised by defense counsel, a reading of the State's closing argument demonstrates that the prosecutor was using the witness testimony to contradict Lee's recorded statements made to the police. The prosecutor referenced quotes from the statements made to Detective Ray on several occasions during her argument.[24]

At one point, the prosecutor made the following comment with regard to promises made by the defense, presumably in the opening arguments which are not contained in the record:[25] "They promised you that you would hear the words from the good Officer George Lee and the words just don't make sense." Defense counsel immediately objected and moved for a mistrial on the basis that this was a reference to his failure to testify. Once outside the presence of the jury, the prosecutor argued to the state trial court that her reference was to his taped statements. Defense counsel argued that it was a reference to his silence at trial.

---

[24]St. Rec. Vol. 22 of 35, Trial Transcript, pp. 1282, 1283, 2/6-10/01.

[25]*Id.*, p. 1284.

A plain reading of the words used by the prosecutor indicates that the comment referenced "words" the jurors had heard and "the words just don't make sense." The trial court also put no credence into defense counsel's arguments that this was a reference to Lee's failure to testify that required a mistrial or admonishment.

The record does not establish that the prosecutor made an improper reference to Lee's failure to testify or that the jury necessarily took the prosecutor's remark as such a reference. The prosecutor's remarks had been and continued to be related to the contradictions posed by Lee's recorded statements which had been played for the jury. Without a showing of some impropriety, Lee fails to state a basis for federal habeas relief.

## 2.   Unavailable Witness

Lee suggests that the district attorney's office caused a key defense witness to become unavailable for trial. Specifically, he argues that Raymond Brown gave police a description that did not match Lee's. Brown had been in custody in the Orleans Parish Prison on armed robbery charges until shortly before the fourth trial, when the State refused those charges and Brown was released. Defense counsel was unable to locate him for trial, and Brown's statement was played for the jury.

The Supreme Court has directed that claims for prosecutorial misconduct in a state conviction are reviewed deferentially. *See*, *e.g.*, *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) (prosecutorial misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process"). The petitioner must show that he was prejudiced by the alleged prosecutorial misconduct, or that it "so infected [his] trial with unfairness as to make [his] conviction a denial of due process." *Id.*, 416 U.S. at 643.

In this case Lee's counsel suggests that Brown's release was timed by the State to prevent his presence at trial. There is absolutely no evidence presented here or in the state courts to support

these suggestions.  Counsel does not even provide a time line or the date of Brown's arrest or his release.

It also is unclear what consideration Lee's counsel has given to Brown's right to be free from custody or to any legitimate basis for the charges to have been refused.  Certainly counsel would not suggest that the State should have delayed Brown's legitimate release once the charges against him were found to be baseless.

As noted by the State, there is no indication in the record what efforts were made by defense counsel to secure Brown's presence prior to his release.  In fact, a reading of the post-conviction hearing transcript indicates that Jenkins remembered that Brown had used an alias and stated that "we could never find him at all."[26]  The record would tend to show that the defense's position was not impacted by Brown's release.

Nevertheless, what is apparent from the record is that Brown's allegedly exculpatory statement was played for the jury.  Because Lee was not deprived of the ability to present Brown's statement, he has not demonstrated prejudice or that his trial was rendered unfair by Brown's release or by counsel's inability to locate him.

Lee has not established that Brown's release was the result of prosecutorial misconduct.  The state courts' denial of relief on this claim was not contrary to or an unreasonable application of federal law.  He is not entitled to relief on this claim.

---

[26]St. Rec. Vol. 34 of 35, Hearing Transcript, p. 8, 4/3/08.

3.      **Disregard for Courtroom Procedure**

Lee claims that the prosecutor showed disregard for courtroom procedure by continuing to talk over defense objections or await a ruling thereon before proceeding.  Counsel suggests that this cumulatively affected Lee's rights to a fair trial.

Federal courts hold no supervisory authority over state judicial proceedings and, as discussed above, may intervene only to correct wrongs of a constitutional dimension.  When a habeas petitioner alleges prosecutorial misconduct, the federal court is limited in its review of the claim to whether the prosecutor violated the petitioner's due process rights. *Darden*, 477 U.S. at 181.  The key to a due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  Prosecutorial "misbehavior" alone does not constitute a wrong of constitutional dimension and does not warrant habeas corpus relief. *Id.*, at 220.

In this instance, Lee would have this Court condemn his trial on constitutional grounds simply because the prosecutor and his own counsel engaged in less than courteous courtroom antics.  This does not alone render his trial unconstitutional or unfair.  Furthermore, it is well settled that suggestions of cumulative error are not enough to violate due process where the individual errors do not amount to constitutional violations.

Federal habeas relief can only be granted for cumulative errors in state trial court proceedings when the individual errors: (1) involved matters of constitutional dimension rather than mere violations of state law; (2) were not procedurally defaulted; and (3) "so infected the entire trial that the resulting conviction violates due process. *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992).  Claims without merit or that are not prejudicial cannot be considered regardless of the total number raised. *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996).  This Court does not find that

any of the courtroom power-plays by either the State or defense counsel with regard to objections during questioning and argument, from voir dire through closing arguments, were errors of a constitutional dimension.

The state courts' denial of relief on this claim was not contrary to or an unreasonable application of federal law.  He is not entitled to relief on this claim.

### C.    Ineffective Assistance of Counsel

Lee claims that he was denied effective assistance of counsel based on numerous alleged errors by trial counsel, as outlined below.  The State argues that Lee's claim is not supported by the record and fails to demonstrate a deficiency in or prejudice from counsel's representation.

Lee raised these grounds for relief in his application for post-conviction relief which was denied by the Trial Court without stated reasons.  The Louisiana Fourth Circuit appellate court also found no merit in the claim citing the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), after making the following comment on the invalidity of the claims: "[I]t is apparent that the record has been scoured extensively and carefully looking for any hint that the relator's counsel was less than perfect.  However, that is not the standard for a claim of ineffective assistance of counsel." That court provided the last reasoned opinion on the issue.  *Ylst*.

The issue of ineffective assistance of counsel is a mixed question of law and fact.  *Richards v. Quarterman*, 566 F.3d 553, 561 (5th Cir. 2009).  Thus, the question before this court is whether the state courts' denial of relief was contrary to, or an unreasonable application of, United States Supreme Court precedent.

As cited by the state appellate court, the standard for judging the performance of counsel was established by the United States Supreme Court in *Strickland*, 466 U.S. at 668.  In *Strickland*, the Court established a two-part test for evaluating claims of ineffective assistance of counsel in which

27

the petitioner must prove deficient performance and prejudice therefrom.  *See Strickland*, 466 U.S. at 697.  To meet the burden of proving ineffective assistance of counsel, the petitioner "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1992); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000), *cert. denied*, 531 U.S. 1167 (2001).

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment.  *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002).  "The defendant must show that counsel's representation fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 687-88; *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998).  The analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all of the circumstances.  *See Strickland*, 466 U.S. at 689.  "[I]t is necessary to 'judge . . . counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690).  Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694; *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999).  Furthermore, "[t]o meet the prejudice prong, the [petitioner] must affirmatively prove, and not merely allege, prejudice."  *DeVille v. Whitley*, 21 F.3d 654, 659 (5th Cir. 1994); *Theriot v. Whitley*, 18 F.3d 311, 314-15 (5th Cir. 1994).  In this context, a reasonable probability of prejudice is "a

probability sufficient to undermine confidence in the outcome." *Id.*  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett*, 796 F.2d at 793.  A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.'  But it is not enough, under Strickland, 'that the errors had some conceivable effect on the outcome of the proceeding.'" *Motley*, 18 F.3d at 1226 (quoting *Strickland*, 466 U.S. at 693).  Thus, conclusory allegations of ineffective assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal habeas relief. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (citing *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)), *cert. denied*, 531 U.S. 849 (2000).

In deciding ineffective assistance claims, a court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test.  *Kimler*, 167 F.3d at 893.  On habeas review, scrutiny of counsel's performance "must be highly deferential" and the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." *Moore v. Johnson*, 194 F.3d 586, 591 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 689-90); *Mattheson*, 751 F.2d at 1441.

### (1)    **Trial Counsel**

Lee has raised numerous points with regard to the performance of one of his trial attorneys, Robert Jenkins.  Lee first makes reference to Jenkins unpreparedness for his testimony at the post-conviction hearing held by the state trial court on April 3, 2008.[27]  Lee notes that counsel had no

---

[27]Rec. Doc. No. 1-2, p. 31.

memory of the details of Lee's case and could not articulate reasons for his trial decisions.  The Court notes that Jenkins's preparedness for the state post-conviction hearing has no bearing on the Court's review under the *Strickland* standard.  That standard requires evaluation of counsel's performance at Lee's criminal trial six years earlier which led to the conviction under attack here.

(a)    <u>**Failed to Prepare for Trial**</u>

Lee argues that his counsel was unprepared for trial on February 6, 2001.  He suggests that counsel misrepresented to the state trial court that he had a federal petition for habeas corpus relief raising double jeopardy pending in the United States District Court for the Eastern District of Louisiana and was entitled to a continuance until that was resolved.  Lee also argues that counsel admitted on the record to the state trial court that they were not prepared to proceed to trial on Lee's case, having prepared a case for another client which was also set that morning.  Lee also seems to argue that counsel should have used Brown's release from prison as a basis for a continuance but did not.

The State argues that Lee's arguments are not based in fact and that the record does not demonstrate that counsel was unprepared or ineffective.

A review of the records of this federal court reflect that Jenkins filed a petition for habeas corpus relief on behalf of Lee on January 29, 2001, under Civ. Action No. 01-0249 "A."[28]  He also filed a motion to stay the state court trial, which at that time was set for February 1, 2001.[29]  On January 30, 2001, the Honorable Charles Schwartz, Jr., denied the motion to stay and later ordered a response from the State.[30]  The Court's order denying the motion to stay was filed at 4:27 p.m. on

---

[28]Civ. Action No. 01-0249"A," Rec. Doc. No. 1.

[29]*Id.*

[30]*Id.*, Rec. Doc. Nos. 2, 3.

January 29, 2001, and was not docketed by the clerk of court until sometime on January 30, 2001. Although the State did not file a response, on March 2, 2001, Judge Schwartz dismissed Lee's habeas corpus petition without prejudice for failure to exhaust state court remedies.

According to the state court record, Lee's case was called to trial and defense counsel immediately moved for a continuance based on the pending federal habeas petition before the start of voir dire, which started at 10:55 a.m., on February 6, 2001.[31]

The records of both courts belie Lee's suggestion that counsel misrepresented the status of the habeas petition in this federal court. Contrary to counsel's argument, the petition had not been dismissed before Jenkins moved for a continuance of Lee's trial; it was not dismissed for almost another month. By the call of trial on February 6, 2001, only the motion to stay had been resolved.

Lee once again misrepresents the facts in support of the claims raised. There is nothing to support any error, intentional or otherwise, in Jenkins's representations made at the motion to continue.

With regard to counsel's statement to the trial court regarding his preparedness, as noted by the State, that is not enough for this Court to find ineffective assistance under *Strickland*. A review of the trial record reflects that counsel, and his co-counsel, were well-prepared to proceed with the trial, the fourth in which he was involved. The co-counsel, Jason Williams, had been with him in the third trial as well.[32] In fact, Jenkins testified at the post-conviction hearing that his comment was a tactical point designed to gain a continuance so the federal habeas could be reviewed.[33] Lee has

---

[31] St. Rec. Vol. 26 of 35, Trial Minutes, 2/6/01 (showing that the motions were handled prior to voir dire, which began at 10:55 a.m.).

[32] St. Rec. Vol. 34 of 35, Hearing Transcript, p. 4, 4/3/08.

[33] *Id.*, p. 9.

not pointed to any particular act by counsel which would prove his unpreparedness and this Court

has found none in its review of this voluminous record.  Conclusory allegations of ineffective

assistance of counsel do not raise a constitutional issue sufficient to support federal habeas relief.

*Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000); *United States v. Holmes,* 406 F.3d 337, 361

(5th Cir.2005) ("mere conclusory allegations in support of a claim of ineffective assistance of

counsel are insufficient to raise a constitutional claim.") (citing *Green v. Johnson,* 160 F.3d 1029,

1042 (5th Cir.1998)).

Finally, Lee is not clear with regard to his complaints about the role the witness Brown had,

or did not have, in the motion to continue or in counsel's preparedness.  Lee again misrepresents the

statements made by counsel at the post-conviction hearing.  Counsel did not state that he sought the

continuance based on Brown's absence.  In fact, when asked if he requested a continuance to find

him, counsel answered: "I can't remember.  Listen, we requested every continuance we could before

that fourth trial started, because we believed that - - all of us at that time - - that we were trying to

get to the Federal Court to stop this prosecution."[34]

In sum, there is no basis in this record to support Lee's contention that his counsel was not

prepared for trial on February 6, 2001.  The state courts' denial of relief on this claim was not

contrary to or an unreasonable application of federal law.  He is not entitled to relief on this claim.

**(b)      Failed to Make Timely Objections, Follow-up on Sustained
Objections, or Press Trial Court for Rulings on Objections**

Lee argues that counsel failed to make his objections in a timely manner, which allowed

improper testimony into the record.  He complains that "many objections" were lodged after the

witness had already answered.  Lee generally refers to the record indicating that it is replete with

---

[34]*Id.*, pp. 8-9.

several examples.  However, he specifically points to only one example where "many objections" were lodged after the witness had already answered.  The Court notes, however, that in its own review of the transcript, the Court instead found that defense counsel repeatedly lodged objections while the prosecutor or a witness was in mid-sentence.  Regardless, as noted by the Louisiana Fourth Circuit, the standard in this instance is not perfection, and that level of performance has never been required by the Supreme Court.

In the one example referenced in Lee's memorandum, Jenkins lodged a hearsay objection to the testimony of U.H.  The prosecutor asked U.H. why she left New Orleans for the month of August after the rape.  After the defense's relevance objection was overruled,  U.H. indicated that she did not want to be here, she did not feel safe and that her friend, Thomas Emory, "told me he would take care of me."  After that last comment, Jenkins made a hearsay objection.  The Court can find no prejudice arising from testimony indicating that Emory wanted to take care of U.H.  Nothing in that statement was prejudicial to the outcome of the case.  Any delay by Jenkins in lodging the objection when he did, was not constitutionally deficient.

Lee also argues that counsel failed to follow-up on sustained objections, noting that after an objection was sustained, the prosecutor was asked the same question without further objection from Jenkins.  Lee claims that counsel should then have "strenuously object[ed]" to the State's questioning.  This, he argues, allowed the jury to hear the impermissible testimony and did not preserve the objection for appellate review.

The Court can find no legal support for the suggestion that once counsel makes and objection he is required by the standards of reasonableness to "strenuously object" in order to double-preserve the objection for appellate review.  In the two instances pointed to in Lee's memorandum, counsel did not object to the testimony itself, he objected to the form of the question.  Although the

prosecutor was told by the Court to rephrase, she did not.  Contrary to Lee's bold assertions, the answers to the questions pointed to did not contain inadmissible testimony.  Lee therefore has not shown how this was prejudicial to his defense or impacted the outcome of the trial.

Lee also complains that counsel would often make objections to which the trial court gave no ruling.  Again, the cited example demonstrates how defense counsel made an objection in the middle of the prosecutor's question.[35]  The prosecutor noted that she had not finished the question, and when she did finish, counsel did not reurge the objection.  Thus, no ruling was required.[36]

In the second example posed by Lee, again counsel misrepresents the record.  Jenkins lodged his objection to the leading questions twice in the middle of the questioning, and the Trial Court did respond by saying "I understand, I'm just trying to rush this thing along."[37]

Even in the remaining examples where the Trial Court did not respond, Lee does not demonstrate that any of the questions or testimony or argument indicated were legally inappropriate or inadmissible to establish that further pursuit was warranted.  Without such a showing, he has not proven that counsel's failure to obtain a ruling or continue his objections was unreasonable or prejudicial.

The state courts' denial of relief on this claim was not contrary to or an unreasonable application of federal law.  He is not entitled to relief on this claim.

(c)   **Failed to State Grounds When Moving for Mistrials**

Lee argues that, during the course of the trial, counsel moved several times for mistrials but did not state specific reasons.  Lee again has pointed to only four instances in the record where

---

[35]Rec. Doc. No. 1-2, p. 36.

[36]St. Rec. Vol. 20 of 35, Trial Transcript, p. 459, 2/6-10/01.

[37]*Id*., p. 880.

counsel raised mistrial in connection with his objections to testimony or argument that was detrimental to Lee's defense.  Lee has not demonstrated where any of these instances actually posed a ground for mistrial.  Counsel drew the "mistrial" card every time the witness or prosecutor made a point that he disagreed with, and the court overruled his evidentiary objection.  Without allowing further comment or argument, the requests were summarily denied by the Trial Court.  Counsel was not given an opportunity to state his reasons in those limited instances.

Counsel is not deficient in failing to give reasons where no such opportunity was provided by the Court.  Furthermore, Lee has not shown where the record supported a legitimate ground for a mistrial at the points referenced in his memorandum.

The state courts' denial of relief on this claim was not contrary to or an unreasonable application of federal law.  He is not entitled to relief on this claim.

### (d)    Introduced Damaging and Prejudicial Information

Lee alleges that his trial counsel referenced prejudicial information about him, including charges that had been dropped and other prior bad acts.  Specifically, Lee refers to the fact that Jenkins called Orleans Parish Assistant District Attorney George Bourgeois to testify regarding screening practices of sex crimes in the prosecutor's office.  The State argues that counsel had a clear strategic reason for calling Bourgeois, and Lee has not established ineffective assistance.

Although Jenkins could not remember at the post-conviction hearing why he called Bourgeois, the trial record is quite clear.  A reading of the entire record reflects a very contentious relationship between Jenkins and the prosecution team.  One of the on-going themes throughout the later trials and the motion practice reflects that Jenkins believed that Lee was, as the State calls him, a victim of a prosecutorial witch-hunt.

Jenkins questioned Bourgeois first about the charge screening process related to the witness Brown, whose charges had been refused the day before trial.[38]  Jenkins then had Bourgeois go through the screening form initially prepared against Lee, to show the nature of the charges had only been accepted as sexual battery.[39]  He then tried to gain testimony from Bourgeois regarding how or why those charges were pumped up to rape after the mistrial on the sexual battery charges and the Pepp second degree kidnapping, which had been dropped.[40]  Jenkins was attempting to establish prosecutorial misconduct, just as he had and Lee continued to allege throughout the proceedings through appeal and post-conviction.

The record is very clear that the purpose behind calling Bourgeois and the presentation of the screening information and prior mistrial information was to demonstrate for the jury that while the State could not prove sexual battery against him, the charges were enhanced to rape after the State failed at the first trial.

As for the testimony from U.H., counsel was questioning her about her identification of Lee.[41]  During her answer, she mentioned that Lee had shown up at the place where she danced. Counsel moved for mistrial, which went unaddressed by the trial court.[42]  At the post-conviction hearing, counsel stated that he was surprised by her testimony, however he knew the State had argued several times in pretrial settings that Lee was stalking and harassing the victims.[43]  He also

---

[38]St. Rec. Vol. 22 of 35, pp. 1093-97, 2/6-10/01.

[39]*Id.*, pp. 1098-1101.

[40]*Id.*, pp. 1102-1109.

[41]*Id.*, pp. 1060-61.

[42]*Id.*, p. 1061.

[43]St. Rec. Vol. 34 of 35, Hearing Transcript, p. 16, 4/3/08.

recalled that, in the defense's opinion, they could not leave that hanging before the jury.  The record supports the conclusion that counsel, once faced with this new testimony and the tacit denial of his motion for mistrial, felt compelled to address the issue before the jury.  This was clearly within the ambit of his trial strategy and does not amount to deficient performance.

Lee has not shown that counsel's trial decisions regarding the testimony developed were outside of reasonable and sound trial strategy under the circumstances of Lee's case.  The state courts' denial of relief on this claim was not contrary to or an unreasonable application of federal law.  He is not entitled to relief on this claim.

(e)       <u>**Failed to Control Himself**</u>

Lee complains that Jenkins voluntarily removed himself from the courtroom during the testimony of Thomas Emory, leaving Lee in the hands of co-counsel, Jason Williams.  Lee does not indicate what if any prejudice this caused him, other than to simply complain that Jenkins was not present at all times.  The State opposes this claim on the basis that Lee has not demonstrated any prejudice from Jenkins absence or Williams' representation during that period.

The record reflects that the trial judge ordered that only one attorney on each side was to handle each witness, which apparently also included objections.  According to Lee, the Court's penalty for violating this rule was removal from the courtroom.  During the testimony of Thomas Emory, Jenkins lodged an objection and later Williams objected to a different point in the testimony.[44]  After the State pointed out the violation, both Jenkins and Williams said they would leave.  Upon the Court's inquiry, Jenkins indicated he would go in the back because Williams could

---

[44]St. Rec. Vol. 20 of 35, Trial Transcript, p. 497, 2/6-10/01.

handle the witness.[45]  Jenkins confirmed at the post-conviction hearing that he and Williams both prepared every witness.[46]

Nowhere in his petition or memorandum does Lee allege any prejudice to him as a result of Jenkins's 45 minute departure during Emory's testimony.  He also does not allege that Williams was deficient or acted to prejudice the defense during that time.  Without some showing or basis to question the effectiveness of counsel during that time, Lee has failed to establish a claim.

The state courts' denial of relief on this claim was not contrary to or an unreasonable application of federal law.  He is not entitled to relief on this claim.

### (f)  Failed to Preserve the Record for Appeal

Lee argues that trial counsel was ineffective for failing to lodge the proper objection to the admission of evidence of prior bad acts at trial.  As discussed previously, Lee has failed to establish that the evidence of prior bad acts admitted at trial fell outside the exception for evidence integrally related to the crime under La. Code Crim. P. art. 404(b).  As such, counsel was not deficient in failing to lodge meritless objections.  *See Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994); *see also, Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) ("This Court has made clear that counsel is not required to make futile motions or objections.").  For this reason, Lee has failed to demonstrate that counsel's performance fell below constitutional standards.

The state courts' denial of relief on this claim was not contrary to or an unreasonable application of federal law.  He is not entitled to relief on this claim.

---

[45]*Id.*, p. 498.

[46]St. Rec. Vol. 34 of 35, Hearing Transcript, p. 14, 4/3/08.

(g)      **Failed to Ensure the Complete Record Was Being Transcribed**

Lee alleges that counsel was deficient for failing to assure that a record was made of bench conferences and conferences in chambers.  The State argues that Lee has not shown he is entitled to relief.

The burden of proof is on the petitioner in a habeas corpus proceeding to establish that a constitutional violation has occurred.  *Swain v. Alabama*, 380 U.S. 202, 226-27 (1965).  The judgment of conviction must be presumed to have been reached in accordance with due process until the petitioner can establish that due process was violated.  *Johnson v. Zerbst*, 304 U.S. 458, 468 (1938).  Conversely, the proceedings violate due process when the petitioner can establish that an error rendered the criminal proceeding fundamentally unfair.  *Lisenba v. People of the State of California*, 314 U.S. 219, 236-37 (1941).  Thus, the habeas petitioner must show beyond just mere assertion that an erroneous transcript rendered it inadequate for full review upon direct appeal or prevented him from obtaining a just determination of an application for post-conviction relief.  *See Mullen v. Blackburn*, 808 F.2d 1143, 1146 (5th Cir. 1987); *Schwander v. Blackburn*, 750 F.2d 494, 497-98 (5th Cir. 1985); *Mack v. Walker*, 372 F.2d 170, 174 (5th Cir. 1966).

When a defendant contends that he was denied due process because of an incomplete transcript, he must establish that the transcript is missing a substantial and significant portion of the record which prohibited appellate counsel from adequate review of the record for purposes of raising claims on appeal.  *United States v. Neal*, 27 F.3d 1035, 1043-44 (5th Cir. 1994) (citing *United States v. Selva*, 559 F.2d 1303, 1305-06 & n.5 (5th Cir. 1977)).

Lee has failed to establish that any unrecorded conferences constituted a significant part of the trial record.  He has made no showing of any significant fact or prejudice which occurred in the bench conferences or how the alleged missing portions of the transcript would have altered the

outcome of his appeal.  *See Mullen*, 808 F.2d at 1146.  Without this, he has not shown a deficiency in trial counsel's performance or resultant prejudice.  The same is true with regard to Lee's suggestion that appellate counsel was remiss in seeking out those portions of the record.

The state courts' denial of relief on this claim was not contrary to or an unreasonable application of federal law.  He is not entitled to relief on this claim.

### (2)    Appellate Counsel

Lee also alleges that his appointed appellate counsel erred by failing to raise meritorious issues on appeal.  Lee specifically refers to her failure to raise as an issue the objection preserved at trial to the sexual assault kit and medical records of T.C.'s examination.  Trial counsel objected to the fact that it was admitted through the investigating officer and not the examining physician. The trial court overruled the objection.  Lee now claims that appellate counsel should have raised it on appeal, because it was preserved.  The State argues that Lee fails to established the denial of competent counsel on appeal.

The Supreme Court has held that "appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."  *Smith v. Robbins*, 528 U.S. 259, 288 (2000); *Ries v. Quarterman*, 522 F.3d 517, 531-32 (5th Cir. 2008).  Appellate counsel may select from among the meritorious claims in order to maximize the likelihood of success on appeal.  *Jones v. Barnes*, 463 U.S. 745 (1983).  "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome."  *Smith*, 528 U.S. at 288 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

Lee's appellate counsel was not required to raise every possible claim appearing on the record.  Lee has made no showing that the unsuccessful objection to the offering of the sexual

assault kit and medical records was non-frivolous or that it was a stronger claim than those actually raised on appeal.  Without some showing, Lee can not succeed under *Strickland*.

The state courts' denial of relief on this claim was not contrary to or an unreasonable application of federal law.  He is not entitled to relief on this claim.

> D.   ***Brady* Violation**

Lee alleges that he was denied a fair trial as a result of the State's failure to provide critical information prior to trial, despite discovery requests, and to provide exculpatory evidence to the defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  Lee specifically references the statements of Marvin Pepp, a handwritten statement made by T.C., U.H.'s medical records, and 48 audiotapes containing witness statements.  The State argues that Lee has failed to establish a *Brady* violation in connection with the fourth trial, which is the only trial relevant to this habeas petition.

Lee raised this claim in his state post-conviction application which was denied by the Trial Court after the evidentiary hearing.  The Louisiana Fourth Circuit also denied relief finding that "*by the conclusion of the fourth and final trial, we do not find that the defense was denied any exculpatory material.*"[47] (italics in original).

Under United States Supreme Court precedent, suppression by the prosecution of evidence favorable to the accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87.  Three factors must be considered to evaluate an alleged *Brady* violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3)

---

[47]St. Rec. Vol. 34 of 35, 4th Cir. Order, 2009-K-0017, 3/18/09.

prejudice must have ensued.  *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

Evidence is material under *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). In *Kyles*, the Supreme Court extended the *Brady* ideal and held that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.  But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, see *Brady*, 373 U.S., at 87, 83 S.Ct., at 1196-1197) the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable."  *Kyles*, 514 U.S. at 438.  Whether evidence is material under *Brady* is a mixed question of law and fact.  *Graves v. Dretke*, 442 F.3d 334, 339 (5th Cir. 2006) (citing *Summers v. Dretke*, 431 F.3d 861 (5th Cir. 2005)).

The United States Fifth Circuit has outlined the four factors used to determine materiality under *Brady* and *Kyles*.  *Graves v. Dretke*, 442 F.3d at 339-40.  First, the petitioner does not have to show that the verdict would have been different, but "whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Kyles*, 514 U.S. at 438.  Second, the materiality test is not a test of the sufficiency of the evidence; instead, a *Brady* violation is established by showing "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Id*., 514 U.S. at 435.  Third, harmless error analysis does not apply.  *Id*.  Fourth, "materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item."  *Id*., at 436.  Information

also is not material under *Brady* if it is merely cumulative of other evidence already before the fact finder.  *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996).

*Brady* applies equally to evidence relevant to the credibility of a key witness in the State's case against a defendant.  *Giglio v. United States*, 405 U.S. 150 (1972). The prosecution's suppression of impeachment evidence requires a showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *United States v. Holley*, 23 F.3d 902, 914 (5th Cir.1994) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

Further, claims pursuant to *Brady* involve "the discovery of evidence after trial of information which had been known to the prosecution but unknown to the defense."  *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). Thus, "when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no Brady claim."  *United States v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980); *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002) (holding that *Brady* does not require prosecutors to furnish a defendant with exculpatory evidence if that evidence is fully available to the defendant through an exercise of reasonable diligence); *Rector v. Johnson*, 120 F.3d 551, 558-59 (5th Cir. 1997) (holding that the State has no duty to lead the defense toward potentially exculpatory evidence if the defendant possesses the evidence or can discover it through due diligence).  *Brady* also does not place any burden upon the prosecution to conduct a defendant's investigation or assist in the presentation of the defense's case.  *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990) (citations omitted); *Bigby v. Cockrell*, 340 F.3d 259, 279 (5th Cir. 2003).

By the terms of *Brady* and its progeny, this Court's focus is on the information provided to the defense by the fourth trial, which is the trial at issue here and which led to Lee's conviction under review.  Lee's arguments stemming from issues in prior trials is irrelevant here.

Lee argues that the State failed to provide the defense with Marvin Pepp's statements to police.  Sergeant Ray testified that he took two statements from Pepp.  After hearing this, defense counsel told the Trial Court that these statements had not been turned over to the defense.[48]  The prosecutor, however, reminded the Court that the tapes had been turned over to the defense counsel.[49]  The Court said to move on.

Once again, Lee does not give a complete recitation of the record facts.  The defense had the statements and the rest of the relevant tapes, as will be further discussed.

Lee next argues that his counsel was not provided with a written statement from T.C.  During her testimony, T.C. indicated that she gave a handwritten statement to police, in addition to her taped statements.[50]  Defense counsel again claims he did not receive that statement.[51]  Unsolicited, T.C. reminded counsel that she talked about the handwritten statement in the first trial.[52]  She also testified that each of her statements were the same.  The Court again told counsel to move on.

Based on the portion of the record partially referenced by Lee, it appears that the existence of the handwritten statement was not suppressed and had been in fact known to the defense since the first trial.  The record does not indicate that it was not turned over, only that counsel did not

---

[48]St. Rec. Vol. 20 of 35, Trial Transcript, p. 367, 2/6-10/01.

[49]*Id*.

[50]*Id*., pp. 634-35.

[51]*Id*., pp. 635-36.

[52]*Id*., p. 636.

44

recall receiving it.  This is not indicative of a *Brady* violation.  Even if the statement was not handed to defense counsel, based on the testimony from T.C., the statement did not contain any exculpatory evidence and it was duplicitous of the information given in her recorded statements already in the defense's possession.  This also would not violate *Brady* or *Kyles*.

Lee also alleges that the State withheld U.H.'s medical records, where she testified at trial that she sought medical treatment after the rape and told the prosecution about it.[53]  Defense counsel asked the Court to have the prosecutor turn over any records they had in their possession.  When the matter was later handled outside of the presence of the jury, the prosecutor responded that the records were not in their possession and that defense counsel could have subpoenaed the records.[54]  The record has no further discussion of the matter.

The record reflects that the State was not in possession of the medical records for them to come under the protections of *Brady*.  This again is something that Lee's counsel here excises from the quoted transcript.  Furthermore, although Jenkins indicated otherwise at trial, there is no indication that the records could not have been obtained by the defense directly from the hospital.  Lee has not shown a *Brady* violation in this regard.

Finally, Lee refers to the alleged withholding of 48 audiotapes of witness statements.  This was a matter handled prior to the third trial.  As outlined in the procedural history of this case, these same tapes were the subject of several motions and writ applications prior to the third trial.  At one point, the Louisiana Fourth Circuit ordered the trial court to conduct the *in camera* inspection of the tapes and that only those containing exculpatory material were to be turned over to the defense.[55]

---

[53]St. Rec. Vol. 22 of 35, Trial Transcript, p. 1054, 2/6-10/01.

[54]*Id.*, p. 1085.

[55]*State v. Lee*, 759 So.2d at 78.

Lee assumes with absolutely no supporting evidence that the tapes were never turned over. Lee assumes this apparently because counsel did not use the tapes at trial. The record does not support Lee's assumptions.

First, during the course of the testimony previously discussed, the prosecutor stated to the trial court, without any objection or comment from defense counsel, that all of the tapes had been turned over to defense counsel.[56] Furthermore, on direct examination at the post-conviction hearing, Jenkins was asked if the tapes had been turned over. He responded, "I can't recall. It's been so long ago. I think they were, but I'm not sure."[57] On cross-examination, Jenkins stated, "I believe we received the tapes . . . and then we finally got the tapes at some point."[58] Thus, contrary to Lee's misstatement of the record, the recollection of counsel was that he did receive the tapes.

Trial counsel also indicated at the post-conviction hearing that he would have listened to any tapes he had, and that he wished he had the statements at the first trial.[59]   Counsel's decision not to use the 48 tapes themselves at trial falls within the ambit of his sound trial decisions, which does not support a finding of deficient performance.

Lee has failed to establish that the State withheld any *Brady* evidence prior to or during his fourth trial, which led to the conviction at issue. The state courts' denial of relief on this claim was not contrary to or an unreasonable application of federal law. He is not entitled to relief on this claim.

---

[56]St. Rec. Vol. 20 of 35, Trial Transcript, p. 367, 2/6-10/01.

[57]St. Rec. Vol. 34 of 35, Hearing Transcript, p. 6, 4/3/08.

[58]*Id.*, p. 26.

[59]*Id.*, p. 6.

**VI.**     **Recommendation**

It is therefore **RECOMMENDED** that George Lee's petition for issuance of a writ of habeas corpus be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).[60]

New Orleans, Louisiana, this 2nd day of May, 2011.

_____

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

---

[60]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.